First National Bank of Cincinnati, et, Plaintiff, *v.*
Oppenheimer, Exr., et, Defendants.

Probate Court, Hamilton County.

No. 4723.   Decided February 16, 1963.

*Messrs. Paxton & Seasongood,* for The First National Bank of Cincinnati, plaintiff.

*Messrs. Wolfson & Goldman,* for Jesse Oppenheimer, individually and as Executor and Trustee under the Will of Harvey Oppenheimer, deceased.

*Messrs. Hoover, Beall & Eichel,* for Robert Block, III, and Linda Block, Minors.

*Mr. Leo Weinberger,* Guardian ad Litem.

DAVIES, J.   The First National Bank of Cincinnati has asked the court for a declaratory judgment concerning certain questions which have arisen in its administration as trustee of a living trust (now valued at approximately $500,000.00) created by Harvey Oppenheimer, a bachelor, on May 9, 1957, when he was seventy-two years old, by the terms of which the

grantor received net income from the trust, controlled investments, reserved the right at any time or from time to time to amend, alter or revoke the trust, in whole or in part, or any provision thereof, by an instrument in writing signed by the grantor and delivered to the trustee in the lifetime of the grantor, and directed what distribution should be made of the trust if it should be revoked in whole or in part. The trust agreement also provided that after the death of the grantor the trustee should distribute the principal and undistributed income of the trust to certain specific beneficiaries and pay and distribute the balance of the trust to the said First National Bank of Cincinnati as trustee under a trust, known as the Oppenheimer Family Trust.

On May 9, 1957, Harvey Oppenheimer executed his will and devised the residue of his estate to the First National Bank of Cincinnati as trustee under the Harvey Oppenheimer Trust.

On June 1, 1957, Harvey Oppenheimer was severely injured in an automobile accident and was hospitalized, at first in the Jewish Hospital and later in the Sheltering Oaks Hospital, which latter hospital serves as a special hospital for long-term chronic disease patients, where Harvey Oppenheimer died on December 2, 1960.

On May 30, 1957, two days before he was injured, Harvey Oppenheimer executed another will, and handed a signed and completely executed copy thereof to his brother, Jesse Oppenheimer, to be delivered to the trust department of the First National Bank of Cincinnati. This will contains the following provisions:

"I have full knowledge of the Will executed by me on May 9, 1957, and a Trust Agreement dated May 9, 1957, which I have studied very carefully since executing those instruments. I have concluded in my own mind that it would not be to the best interest of my estate to have a prolonged Trust. Accordingly, and by this instrument, my Last Will and Testament, I am hereby revoking the Will and Testament made by me and signed on May 9, 1957. I am also revoking the Trust Agreement entered into between the undersigned and the First National Bank of Cincinnati, Ohio, dated May 9, 1957, in its entirety, except, that the First National Bank of Cincinnati, Ohio, shall handle

my affairs as set forth in said Trust Agreement *only* during my lifetime. That upon my decease, said First National Bank shall deliver over to my Executor all of the corpus and undistributed assets of my said estate, which shall include all securities, written instruments and any other papers or documents in connection with my said estate, which will be dealt with in accordance with this my Last Will and Testament.

"This, Item 14 of my Last Will and Testament shall serve as notice to the Trustee under the Trust Agreement executed by me on May 9, 1957, as a Revocation of the Trust except as above set forth in this Item and shall be in compliance with Item Third of said Trust Agreement relating to notification of revocation of Trust."

The signed copy of the will of May 30, 1957, was received by the First National Bank of Cincinnati on January 15, 1959 (about twenty months after its execution) in a letter sent to it by Jesse Oppenheimer.

The said will dated May 30, 1957, was admitted to probate in the Probate Court of Hamilton County and Letters Testamentary thereon were issued to Jesse Oppenheimer on December 8, 1960, and said executor thereafter made demand on the First National Bank requesting delivery to him of the assets held by the bank as trustee under the Harvey Oppenheimer Trust created on May 9, 1957, contending that said trust, by the terms of Harvey Oppenheimer's will of May 30, 1957, terminated upon his death on December 2, 1960.

The First National Bank in its petition for a declaratory judgment has asked the court for a declaration upon the following questions:

1. Whether the Harvey Oppenheimer trust was partially revoked or modified in the manner provided in Item 14 of the will of Harvey Oppenheimer, deceased.

2. Whether the Harvey Oppenheimer trust terminated on December 2, 1960, or at any time thereafter, or whether said trust is now in full force and effect.

3. Whether the plaintiff, as trustee under the Harvey Oppenheimer trust, should deliver the assets held by it as such trustee to Jesse Oppenheimer, as executor of the estate of Harvey Oppenheimer, deceased, or whether plaintiff as such

trustee should administer and dispose of such assets in accordance with the provisions of the Harvey Oppenheimer trust agreement.

Plaintiff also prayed for such other relief, in law or in equity, as may be proper and just.

In his answer, individually and as executor under the will of Harvey Oppenheimer, deceased, Jesse Oppenheimer has asked the court for a declaratory judgment, declaring:

1. That the Last Will and Testament executed by Harvey Oppenheimer, on May 30, 1957, revoked the will executed by him on May 9, 1957;

2. That the Last Will and Testament executed by Harvey Oppenheimer on May 30, 1957, revoked the Trust Agreement executed by him on May 9, 1957, in its entirety, except that The First National Bank was to handle his affairs as per the Trust Agreement, *only* during his lifetime and that upon his death, The First National Bank was to deliver the entire corpus and undistributed assets over to decedent's executor;

3. That Item 14 of said Last Will and Testament of Harvey Oppenheimer, decedent herein, of May 30, 1957, served as notice to the Trustee as a revocation of the trust in compliance with Item Third of said Trust Agreement relating to notification or revocation of trust, dated May 9, 1957;

4. That the Trust Agreement between Harvey Oppenheimer, decedent herein, and The First National Bank of Cincinnati, Ohio, dated May 9, 1957, terminated on December 2, 1960, the date of the death of Harvey Oppenheimer, decedent herein, and that upon said date, said Trust Agreement became null and void and without force or effect:

5. That The First National Bank of Cincinnati, Ohio, as trustee under the agreement made by it and Harvey Oppenheimer, dated May 9, 1957, be ordered to deliver the assets held by it as such trustee to Jesse Oppenheimer, the duly appointed, qualified and acting executor and trustee under the Last Will and Testament of Harvey Oppenheimer, deceased, dated May 30, 1957.

When Harvey Oppenheimer created his living trust on May 9, 1957, he had three living brothers (Manuel, Isidor, and Jesse) and two living sisters (Blanche and Jennie). None of

the brothers and sisters had children except Jesse who had one daughter, the defendant, Carolyn O. Goldman who with her four minor children survive Harvey, as do also his brothers, Isidor and Jesse, and his sister, Blanche.

The Oppenheimer Family Trust was established by an agreement dated June 15, 1956, between Harvey Oppenheimer, his brother, Isidor, and sisters, Blanche and Jennie, and the First National Bank of Cincinnati, as trustee. This trust provides that until the death of the last survivor of the Oppenheimer brothers (Manuel, Isidor, Harvey and Jesse) and sisters (Blanche and Jennie), the net income from the trust should be paid, in equal shares, to such of the brothers and sisters as are living, from time to time, with provision for payment of income to the wife of Jesse Oppenheimer of his share after his death. The agreement also provides that after the death of all of the Oppenheimer brothers and sisters, 25% of the trust income is to be paid to Jesse's wife during her lifetime, and the balance of the income to be paid to Carolyn O. Goldman during her lifetime. The trustee is authorized to pay Carolyn such amounts of principal as it deems necessary for her comfortable support, maintenance, and welfare. Subject to a continuing provision to provide income to Jesse's wife during her life, upon Carolyn's death the remaining principal and accumulated income of the trust is to be divided into separate equal trusts for Carolyn's then living issue, each of such trusts to continue until the beneficiary attains the age of 35, at which time the trust will terminate and be distributed to such beneficiary.

A question has arisen as to whether or not a will, or an executed copy thereof, qualifies as "an instrument in writing" by which Harvey Oppenheimer can amend, alter, or revoke, in whole or in part, the trust which he created with the First National Bank on May 9, 1957, if such will was delivered to the trustee during his lifetime.

Bouvier's Law Dictionary defines an "instrument" as a "document or writing which gives formal expression to a legal act or agreement for the purpose of creating, securing, modifying, or terminating a right; a writing executed and delivered as the evidence of an act or agreement."

Black's Law Dictionary defines an "instrument" as a "written document; a formal or legal document in writing, such as a contract, deed, will, bond, or lease."

For numerous cases which define a will as an "instrument in writing" see 21 A Words and Phrases, 520, et seq. *Baker* v. *Baker et al.*, 51 Ohio St., 217, 37 N. E., 125; 41 Ohio Jurisprudence, 262; 94 C. J. S., 898; 57 Am. Jur., 40; Vol. 1, Page on Wills, Section 1.2, p. 2.

We, therefore, must conclude that both a will and a fully executed copy of an original will can properly be described as instruments in writing.

We next are confronted with the question as to whether or not a will, because of its ambulatory nature, is an instrument which will enable a trustor to amend, alter, or revoke a revocable living trust by delivering an executed copy thereof to the trustee in the lifetime of the testator grantor.

It is elementary that, until the death of the testator, a will is ambulatory and takes effect as a will only after the maker's death, and until then it is revocable. 41 Ohio Jurisprudence, 263; 94 C. J. S., 899; 57 American Jurisprudence, 40; Vol. 1, Page on Wills, Section 1.2, p. 3; Vol. 1, Page on Wills, Section 5.17, p. 206.

It has been held that where an instrument of trust *inter vivos* reserves in the settlor "the power to alter or amend the disposition to be made of the trust estate after my decease," conditioned upon a signed written instrument delivered to the trustee, an attempted revocation made by will, no written instrument having been delivered to the trustee during the lifetime of the settlor, does not revoke the disposition made under the terms of the trust. *Magson, Admr.* v. *The Cleveland Trust Co.*, 101 Ohio App., 194; *Leehy* v. *Old Colony Trust Co. et al.*, 326 Mass., 49; 93 N. E. (2d), 238. In these cases neither the wills nor executed copies of the wills were delivered to the trustees during the lifetimes of the grantors. In the case of *Hackley Union National Bank* v. *Farmer*, 252 Mich. Reports, 674, it was held that "execution and acknowledgment by donor before notary in Germany of formal instrument revoking trust agreement, and mailing certified copy thereof to trustee by donor was sufficient to work revocation under its terms pro-

viding that it might 'be revoked by the donor at any time during his life by instrument in writing signed and acknowledged by the donor and delivered to the trustee,' although original was retained by notary under laws of Germany, and certified copy was not received by trustee until after donor's death.''

It is possible that an instrument may be in part a will and in part an instrument of a different type. Vol. 1, Page on Wills, Section 6.7, p. 241. An instrument which contains language appropriate to two or more different types of instruments will be construed in accordance with the intention of the testator as deduced from the instrument as a whole and from any extrinsic evidence that might be introduced and the inconsistent provisions will be eliminated and ignored as surplusage. Vol. 1, Page on Wills, Section 6.4, p. 232.

We, therefore, hold that when an instrument of trust *inter vivos* reserves in the settlor the right to amend, alter, or revoke the trust, in whole or in part, by an instrument in writing signed by the grantor and delivered to the trustee in the lifetime of the grantor, such trust may be amended, altered, or revoked by appropriate language contained in the settlor's will providing such will or a signed copy thereof is delivered to the trustee during the lifetime of the grantor, and such delivery may be made to the trustee by the trustor's duly constituted agent.

We finally must decide if the executed copy of Harvey Oppenheimer's will was delivered by his agent, Jesse Oppenheimer, to the trustee in the lifetime of the grantor which would enable him to ''amend, alter or revoke'' the trust of May 9, 1957, as specified in his will dated May 30, 1957.

The evidence shows that Harvey Oppenheimer sustained a skull fracture in the accident in which he was involved on June 1, 1957, which resulted in a subdural hematoma. He was confined in hospitals from the time of the accident until his death on December 2, 1960. He was confined either to a wheel chair or bed. He had to be restrained in bed. He required twenty-four hour nursing service. He could not carry on a conversation. He could only make gutteral sounds. He was incontinent and unable to feed himself. It was necessary for his brother, Jesse, or someone else to carry on all business trans-

actions for him. He was, in fact, on January 15, 1959, the date on which the First National Bank received the copy of his will, a person of unsound mind and incompetent, both mentally and physically, to understand or transact any business. He was mentally and physically, at that time, personally incapable to sign or deliver to his trustee an instrument in writing which could amend, alter or revoke the trust which he had previously created.

We must, therefore, consider the effect of the grantor's incompetency upon his, or his agent's, ability to amend, alter or revoke a trust during such disability.

It has been held that if the settlor is not under an incapacity at the time when he creates the trust, but he subsequently becomes under an incapacity, he cannot thereafter terminate the trust. Thus, if the settlor becomes insane or is judicially declared a spendthrift, he cannot terminate the trust. Restatement of the Law of Trusts (2d), Section 339, p. 171. Insanity of the principal subject to the creation of the agency no doubt operates to revoke the agency as to all who have notice of the fact. 2 Ohio Jurisprudence (2d), 71. Authority given to his agent by an insured to change the beneficiary of the latter's insurance policy as directed, but which authority remains unexercised until after the insured is declared a mental incompetent and is placed under guardianship both as to person and estate, does not survive the adjudication of incompetency and may not thereafter be exercised by such agent. *In re: Estate of Sellers*, 154 Ohio St., 483.

A revocation (of an agency) by operation of law may be by a change of condition or of state, producing an incapacity of either party. This proceeds upon a general rule of law, that the derivative authority expires with the original authority from which it proceeds. The power of constituting an agent is founded upon the right of the principal to do the business himself; and when that right ceases, the right of creating an appointment, or of continuing the appointment of an agent already made, for the same purpose, must cease also. - - -. So, if a principal should become insane, that would or might operate as a suspension or revocation of the authority of his agent during the continuance of the insanity; for the party himself,

during his insanity, could not personally do a valid act; and his agent cannot, in virtue of a derivative authority, do any act for and in the name of his principal, which he could not lawfully do for himself. Story on Agency (9th ed.), Section 481, p. 592.

The act of every agent exercising a bare power or authority necessarily presupposes the existence of a principal competent to perform the same act himself in his own behalf. It is his will that is being carried out through the medium of the agent. If for any reason, therefore, the principal becomes incapable of acting and exercising an intelligent will in regard to the transaction, it is evident that an essential element in the relation is lacking, and while that element remains absent, the further exercise of the relation must be suspended. Vol. 1, Mechem on Agency (2d ed.), Section 676, p. 480.

It is the general rule, therefore, that the after-occurring insanity of the principal or his incapacity to exercise any volition upon the subject by reason of an entire loss of mental power, operates as a revocation or suspension for the time being, of the authority of an agent acting under a bare power. Vol. 1, Mecham on Agency (2d ed.), Section 677, p. 480. The loss of capacity by the principal has the same effect upon the authority of the agent during the period of incapacity as has the principal's death. Restatement of the Law of Agency (2d), Section 122, p. 308.

Since insanity or mental incapacity of a principal revokes or, in some instances during the existence of such incapacity, suspends authority previously delegated to an agent, the authority delegated to Jesse Oppenheimer by Harvey Oppenheimer on May 30, 1957, to deliver an executed copy of Harvey's will to the First National Bank had been revoked because of Harvey's mental incapacity on January 15, 1959, the date on which Jesse delivered the executed copy of Harvey's will to the bank, and the delivery of such instrument could not, and did not, operate as an amendment, alteration or revocation of the trust which Harvey Oppenheimer had created.

Consequently, the plaintiff, the First National Bank of Cincinnati, is obligated, as trustee, to carry out the provisions of the Harvey Oppenheimer trust in accordance with the terms and conditions of that trust created by him on May 9, 1957,